**Judith A. SMITH and James R. Smith, Plaintiffs–Appellants,**

v.

**EXECUTIVE CUSTOM HOMES, INC., Defendant–Appellee.**

**No. 08CA0426.**

Colorado Court of Appeals, Div. III.

Feb. 5, 2009.

Certiorari Granted June 22, 2009.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2008.

Hanes & Schutz, LLC, Timothy J. Schutz, January D. Barrett, Colorado Springs, Colorado, for Plaintiffs–Appellants.

Vaughan & DeMuro, Gordon L. Vaughan, Jessica Kyle Muzzio, Colorado Springs, Colorado, for Defendant–Appellee.

Opinion by Chief Judge DAVIDSON.

In this personal injury action, plaintiffs, Judith and James Smith (collectively, homeowners), appeal from the summary judgment dismissing with prejudice their complaint against the homebuilder, defendant, Executive Custom Homes, Inc. (ECH). We reverse based on the equitable tolling of the statute of limitations under the repair doctrine and remand with directions.

## I. Background

This case arises out of Judith Smith's personal injuries sustained on February 2, 2005, when she slipped and fell on ice on the front walkway of her residence. Homeowners purchased the residence from ECH in 2001, shortly after construction was completed. The home is located in a retirement community of "patio homes" developed by ECH, consisting of residences with shared walls, commonly referred to as "townhomes." The community is managed by a homeowners association which employs a professional property management company, Z & R Property Management, to maintain the properties. The property manager is the liaison between the homeowners and ECH for any complaints about the construction of the residences.

On February 6, 2004, homeowners noticed an accumulation of ice in front of the first step on the sidewalk leading to their front door. On that same date, James Smith sent an e-mail to the property manager for the subdivision, which stated: "Hi Guys, There's been a sheet of ice that formed on my sidewalk in front of the bottom step from melted snow dripping down from above. I feel this is a construction defect & should be repaired by or reembursed [sic] by Executive Custom Homes. Thank you, Jim Smith."

The property manager forwarded the e-mail to ECH, which, without informing homeowners, arranged for third-party defendant, Intrawest Seamless Gutters (not a party to this appeal), to inspect homeowners' roof and rain gutters. On February 13, ECH informed the property manager that an inspection showed leaking gutters which needed to be "sealed better" and that Intrawest would "wait until the snow had melted" to "go back out there over the next week or so and make the repair." ECH further informed the property manager, in that e-mail, that homeowners had not been contacted because ECH did not have their telephone number. Between February and June of 2004, Intrawest made repairs to the roofs

and rain gutters of a number of homes in the subdivision, including homeowners'.

On February 2, 2005, Judith Smith slipped on ice accumulated on the front walkway and sustained injuries. In a letter dated June 20, 2006, homeowners contacted ECH regarding the accident. In response, ECH informed homeowners of Intrawest's 2004 repair efforts. However, ECH did not inform homeowners, but subsequently admitted in discovery responses, that Intrawest had failed to satisfactorily repair the gutters.

ECH further admitted that, again without informing homeowners, it continued its efforts to remedy leaking gutters in the subdivision after Judith Smith's injury. In connection with these efforts, the homeowners association retained another company to inspect the roofs and rain gutters of several homes in the subdivision, including homeowners', and an inspection report, dated January 25, 2006, identified snow melt from leaking rain gutters accumulating in dangerous icy patches below the rain gutters. As pertinent here, the report stated that homeowners' home suffered from "loose tile/missing flashing/tile overhangs the gutter/flashing not secured," and concluded by stating, "DUE TO SEVERE ICING PROBLEMS IN OR NEAR THE ENTRYWAY, THESE HOMES MUST BE REPAIRED IMMEDIATELY! !!!!" (emphasis in original). ECH admitted that it undertook repairs on some of the homes identified in the report but did not indicate if homeowners' residence was part of that particular repair effort. At some time after the accident, however, homeowners' residence was satisfactorily repaired.

On January 17, 2007, homeowners filed their complaint against ECH. In a motion for summary judgment, ECH asserted that, based on undisputed facts, homeowners' claims were time-barred by the two-year statute of limitations set forth in section 13–80–104, C.R.S.2008. The trial court agreed and dismissed the case. This appeal followed.

Summary judgment is a drastic remedy, appropriate only if the pleadings, affidavits, depositions, or admissions show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Civil Serv. Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo.1991); *Kellum v. RE Servs., LLC*, 30 P.3d 875, 876 (Colo.App.2001). In determining whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 83 (Colo.1999).

We review a grant of summary judgment de novo. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 71 (Colo.2004).

We conclude that (1) the trial court correctly interpreted section 13–80–104 to determine that homeowners' complaint had been filed beyond the two-year statute of limitations, but that (2) the trial court erred in granting summary judgment on the question of whether the statute was tolled under the repair doctrine.

## II. Statute of Limitations—Accrual of Personal Injury Claim

■ Homeowners' claims are based upon personal injuries allegedly resulting from the defective construction of their home. Thus, the applicable statute of limitations is set forth in the Construction Defect Action Reform Act (CDARA), section 13–80–104. *See Homestake Enterprises, Inc. v. Oliver*, 817 P.2d 979, 984 (Colo.1991). As relevant here, under CDARA an action must be "brought within [two years] after the claim for relief arises." § 13–80–104(1)(a), C.R.S.2008.

The question raised is when, under the statute, homeowners' claims arose. Homeowners contended in the trial court, and contend again on appeal, that CDARA must be interpreted so that their claims arose on the date of the accident, February 2, 2005. The trial court disagreed, and determined that, under CDARA, the claims arose on February 6, 2004, the undisputed date that homeowners discovered the accumulated ice. We agree with the trial court.

Section 13–80–104(1) provides, in relevant part,

(b) (I) Except as otherwise provided in subparagraph (II) of this paragraph (b), *a*

*claim for relief arises under this section at the time the claimant or the claimant's predecessor in interest discovers or in the exercise of reasonable diligence should have discovered the physical manifestations of a defect in the improvement which ultimately causes the injury. . . . .*

(c) *Such actions shall include any and all actions in tort, contract, indemnity, or contribution, or other actions for the recovery of damages for:*

(I) Any deficiency in the design, planning, supervision, inspection, construction, or observation of construction of any improvement to real property; or

(II) Injury to real or personal property caused by any such deficiency; or

(III) *Injury to or wrongful death of a person caused by any such deficiency.*

(Emphasis added.)

The statutory language is quite clear: a claim for relief under CDARA arises, not on the date of a physical injury, but when the physical manifestation of the defect "which ultimately causes the injury" is discovered. By plain and unambiguous language, the General Assembly expressed its intent that a construction defect claim accrues when the manifestation of the defect is discovered, no sooner and no later. *See, e.g., Highline Village Assocs. v. Hersh Cos.,* 996 P.2d 250, 256–257 (Colo.App.1999) (a property damage claim accrues under CDARA when the defect becomes manifest, even if its cause is not known), *aff'd in part and rev'd in part on other grounds,* 30 P.3d 221 (Colo.2001) (*Hersh*); *People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986) ("If the language is clear and the intent appears with reasonable certainty, there is no need to resort to other rules of statutory construction.").

Homeowners do not dispute this plain reading of the statute. And, they have no quarrel with a plain language interpretation of the statute in cases involving property damage or personal injury that occur at the same time as the manifestation of the construction defect. However, they point out, under such interpretation, a CDARA claim for serious personal injury would be barred simply because the injury occurred two years and a day after a minor construction defect

was noted. Thus, they argue, applying a plain language reading in circumstances such as these, where the personal injury does not occur until after the observation of the manifestation of the defect, is unfair and absurd because it precludes recovery for injuries which were not foreseeable at the time the physical manifestation of a construction defect was noticed, and encourages unnecessary lawsuits by effectively requiring a CDARA plaintiff to file a claim prior to sustaining any injury.

We agree with homeowners that statutory interpretation should avoid absurd results, *see, e.g., Crowe v. Tull,* 126 P.3d 196, 201 (Colo.2006), and we understand the point homeowners are making. As the trial court stated, "if this Court had legislative powers, it might have drafted the statute differently." However, as the trial court acknowledged, it is not for a court to interfere with the legislature's explicit determination that in all statutory construction defect cases, the need for faster resolution of claims trumps the need to wait for an injury to occur. *See CLPF–Parkridge One, L.P. v. Harwell Investments, Inc.,* 105 P.3d 658, 664 (Colo.2005) (purpose of CDARA is to streamline construction litigation); *Thermo Development, Inc. v. Central Masonry Corp.,* 195 P.3d 1166, 1170 (Colo.App.2008) (purpose of CDARA is to encourage the timely resolution of construction disputes); *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.,* 3 P.3d 30, 38 (Colo.2000) ("It is not up to the court to make policy or to weigh policy."); *Martin v. Union Pacific R.R. Co.,* 186 P.3d 61, 68 (Colo.App.2007) *(cert. granted* June 30, 2008) ("[P]olicy judgments are the exclusive province of the General Assembly.").

Moreover, regardless of the wisdom of the legislature's policy decision, the result is not absurd. Potential injury, more often than not, is foreseeable with construction defects, and adopting a policy that such problems should be remedied sooner rather than later, via litigation or otherwise, is not irrational. For example, here, it was foreseeable that the accumulation of ice on the front sidewalk of homeowners' residence, resulting from an identified construction defect, could result in

injury, and it is not absurd that notice of the ice should trigger homeowners' responsibility to take some action in response. *Compare W.T. Grant Co. v. Casady,* 117 Colo. 405, 412, 188 P.2d 881, 884 (1948) (no common law duty to keep walks free from snow and ice), *with Homestake,* 817 P.2d at 983–84 (accumulation of ice resulting from improper operation of sprinkler system exposed contractor to liability for negligence under CDARA).

### III. Equitable Tolling— The Repair Doctrine

■ We have determined that, under CDARA, property owners must act with diligence upon the discovery of a construction defect or risk possible forfeiture of their action for the defect, including an action for personal injuries occurring after the defect was discovered, by expiration of the statute of limitations.

■ However, the running of a statute of limitations can be equitably tolled by a form of promissory estoppel referred to as the "repair doctrine." That doctrine allows tolling of a limitations period when a plaintiff can show that after a defect was noticed (1) repairs were attempted; (2) representations or promises, express or implied, were made by the defendant that the repairs would remedy the defect; (3) the plaintiff reasonably relied on the representations or promises; and (4) as a result, the plaintiff delayed filing a legal action against the defendant. *Highline Village,* 996 P.2d at 255.

■ Both the trial court and the parties recognized the repair doctrine and its applicability here. We agree. The doctrine has been recognized by divisions of this court, *see id.* at 256–57; *Curragh Queensland Mining Ltd. v. Dresser Indus., Inc.,* 55 P.3d 235, 239–40 (Colo.App.2002), and although the supreme court has not yet applied it, it has not rejected it. *See Hersh,* 30 P.3d at 226 ("At least where a contract contains an express warranty to repair or replace, the judicially imposed, equitable tolling characterized by the court of appeals as the 'repair doctrine' is not applicable."); *Curragh,* 55 P.3d at 239 ("Significantly, the supreme court [in *Hersh* ] did not reject the repair doctrine; it simply said the doctrine was either inappli-

cable or unnecessary under the facts of that case.").

In the trial court, ECH did not contest that application of the repair doctrine involved questions of fact but argued that there were no disputed issues of fact because homeowners presented no evidence showing they were aware of repairs in 2004 or that they relied on such repairs in deferring their lawsuit. The trial court agreed. While acknowledging that homeowners had timely alerted ECH of the defect, the court determined that they could not have reasonably relied upon any promise of repair by ECH because no promise was made directly to them and they presented nothing to show that they were aware of any attempts at repair.

However, drawing all favorable inferences in homeowners' favor, *see Redmond v. Chains, Inc.,* 996 P.2d 759, 762 (Colo.App. 2000), under the particular circumstances here, we conclude that summary judgment is inappropriate to resolve this issue.

■ The repair doctrine protects a homeowner who has duly sought to remedy a defect but who was led "to reasonably believe that [he or she] will receive satisfaction without resort to litigation." *Highline Village,* 996 P.2d at 255 (quoting *City of Bedford v. James Leffel & Co.,* 558 F.2d 216, 218 (4th Cir.1977)). Thus, the promise of repair relied upon by a party invoking the repair doctrine need not be directly communicated to that party, *see Curragh,* 55 P.3d at 239, but "may be one that is reasonably implied from all of the circumstances." *Highline Village,* 996 P.2d at 256. A promise implied in fact is one "existing by inference from the circumstances or actions of the parties." *Black's Law Dictionary* 1250 (8th ed. 2004).

A property owner typically is responsible for directly contracting for repairs to his or her property. In that situation, it certainly is not reasonable to infer a promise to repair from someone who has failed to act or respond to a property owner's request to repair. Here, however, homeowners were part of a multi-home community which, according to the limited record, had specific procedures by which homeowners were to direct con-

struction defect complaints to the property manager, who, in turn, would direct them to ECH. Because of these procedures, it is not unreasonable to find that ECH was promising to remedy the problems when a homeowner's request was duly made, unless the homeowner was notified to the contrary.

Here, it was undisputed that homeowners not only promptly complied with the procedures, but expressly demanded that ECH either repair the condition or reimburse them for the costs of the repair if it refused. Particularly because homeowners' demand mandated that ECH make a choice, a trier of fact could find from the lack of a response that ECH was neither reneging on its generic promise to make repairs when duly requested nor placing the responsibility for the repair back on homeowners.

Moreover, it was not disputed that, after making their demand, homeowners did not notice any further incidents of ice or water accumulation until the date of the accident. Thus, regardless whether homeowners knew of the actual repairs being undertaken in 2004, it would not be unreasonable for them to assume under these particular circumstances that repairs were being undertaken to fix the icing problem.

Therefore, drawing all inferences from the undisputed facts in homeowners' favor, we conclude that because they duly complied with the development's procedures for obtaining construction defect repairs, and because ECH failed to communicate anything in the nature of a refusal to homeowners, homeowners could reasonably have understood ECH to have promised to undertake the requested repair. We further conclude that the absence of subsequent manifestations of the defect for nearly a year after the request for repair was made could have reasonably led homeowners to assume that no further action was necessary—including legal action—because the repairs had been made.

Accordingly, although we agree with the trial court that the undisputed facts show that homeowners' lawsuit was filed beyond the applicable statute of limitations, whether the repair doctrine should toll the running of the statute was not appropriately resolved, at least not at this early stage of the proceedings, on summary judgment.

The judgment is reversed and the case is remanded with directions to the trial court to reinstate homeowners' complaint and to conduct further proceedings as necessary.

Judge NEY * and Judge KAPELKE *, concur.